**Merrill KARLEN, Appellee,**

v.

**BUTLER MANUFACTURING COMPANY, Appellant.**

No. 74–1941.

United States Court of Appeals, Eighth Circuit.

Submitted May 13, 1975.

Decided Dec. 11, 1975.

Donald J. Porter, May, Porter, Adam, Gerdes & Thompson, Pierre, S. D., for appellant. Rebuttal was made by Mr. Porter.

Wally Eklund, Johnson, Johnson & Eklund, Gregory, S. D., for appellee.

Before HEANEY and STEPHENSON, Circuit Judges, and TALBOT SMITH,* Senior District Judge.

TALBOT SMITH, Senior District Judge.

This is a diversity case arising out of the spoilage, through moisture, of a portion of plaintiff Karlen's wheat. The wheat was stored in a building manufactured by defendant Butler Manufacturing Company, of Missouri (hereafter Butler) and sold to plaintiff by the Cook Implement Company (hereafter Cook). It is alleged that there was a breach of warranty by both Butler and Cook. The jury awarded damages to plaintiff in the sum of $21,370. We reverse and remand for new trial.

The action as originally framed claimed breach of express and implied warranties, asserted negligence, and relied as well on strict liability in tort. On plaintiff's motion at the close of his case in chief the counts in negligence and strict liability were dismissed. We therefore consider a breach of warranty action.

There is much argument in the briefs as to express and implied warranties [1]

---

* TALBOT SMITH, Senior District Judge, Eastern District of Michigan, sitting by designation.

[1]. The Court's instructions as to express and implied warranties were taken directly from the Uniform Commercial Code, SDCL 1967 §§ 57–4–26 and 57–4–33:

With reference to express warranty, there was in effect in South Dakota, at the time of the sale in South Dakota in 1972, a statute, the relevant portion of which provides:

Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

The fact that I read this provision of the statute to you does not mean that there was such a warranty. It is for you to decide whether there was such a warranty in this case and, if so, whether the warranty became part of the basis of the bargain. It is also for

and to breaches thereof, and of their application to these facts. But basic to any question of breach of warranty is a problem as to the scope or extent of the warranty claimed to be made and breached. Here it relates, generally speaking, to the weathertight quality of the building sold by the defendant. But Butler did not sell a completed building. It sold the component parts thereof. As to their assemblage its brochures offered three alternatives: a) by the purchaser himself, a do-it-yourself job "using tools and equipment readily available"; b) a modified do-it-yourself, but "under the supervision of a foreman provided by the Butler Agri-Builder"; c) by an Agri-Builder crew, "your experienced Agri-Builder * * * offers turnkey construction *if desired*" (emphasis ours).[2]

The plaintiff's claim is that this latter alternative was what he desired, what he contracted for, and what he did not get, to his damage. As he puts it, in more detail,

In the present case Butler's responsibilities arose from the fact that plaintiff relied on and it represented and held out to the plaintiff through its brochures, published advertising and through its dealer ("Agri-Builder") that if plaintiff purchased the building in question *and had it constructed by an agri-builder* that it would provide a safe, weatherproof storage for grain. Proof submitted to the jury by Karlen showing that the building was not con-

structed in the manner warranted is sufficient to support a cause of action upon either the theory of breach of express or implied warranty. [Emphasis added.]

In short, Butler's warranty before us was that its building would provide weatherproof storage for grain if "as desired" it was constructed by an Agri-Builder. There is no proof of defect in the building as shipped. The problem lay in the construction, our first issue of fact. Defendant says it was actually constructed by a general contractor hired by the plaintiff farmer himself, and that the local dealer, Cook, was not its (Butler's) agent either to construct or to sublet the construction. The plaintiff, on the other hand, contends that his agreement with Cook was that "the building would be properly constructed by a 'Butler Agri-Builder' and * * * that the building was not constructed properly as promised." Cook is denominated a Butler "Agri-Builder" in its franchise agreement and displayed the "Butler Agri-Builder" label on its sales invoice with Karlen.

The record is a conglomeration of contradictions. Plaintiff Karlen's testimony was that being in need of a wheat storage building, he contacted Mr. Cook, a local farm implement dealer, doing business as the Cook Implement Company. From him he received literature of the Butler Company describing the Butler buildings in glowing terms, making it

you to determine, if there was such a warranty, whether there was a breach thereof, and if there was such a breach of an express warranty, whether this was a proximate cause of the damage complained of.

If you find that there was no such express warranty, or if there was, that there was no breach thereof, this would end your consideration of this part of the case.

Another one of plaintiff's claims is that there is what is called an implied warranty of fitness for the purpose.

With reference to implied warranty, there was in effect in South Dakota at the time of sale in South Dakota in 1972, a statute the relevant portion of which provides:

Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or

judgment to select or furnish suitable goods, there is unless excluded or modified, an implied warranty that the goods shall be fit for such purpose.

The fact that I read this provision of the statute to you does not mean that there was such a warranty. It is for you to decide whether there was such a warranty, whether there was a breach thereof, and if there was such a breach of an implied warranty whether it was the proximate cause of the damage complained of.

If you find that there was no such implied warranty, or if there was, that there was no breach thereof, this would end your consideration of this part of the case.

2. The quotations are from plaintiff's exhibits 23, 24 and 43.

clear that if one were to purchase such a building, and had it constructed by an "Agri-Builder" (although, as we noted, "many farmers are erecting their own buildings, using tools and equipment readily available") it would provide a safe and weathertight storage for grain. It was Karlen's claim that he then returned to Cook and discussed the price therefor, including labor. It was his belief, he stated, that Cook was an Agri-Builder and that in such capacity he undertook to construct the building for him.[3] Karlen testified that he would not have purchased the building "unless they [meaning Cook] could get it erected," and that it was agreed that "they would erect the building on my foundation," although he, Karlen, would undertake to do the concrete work for the building. The building was actually erected by Mr. Wayne Hebron, a building contractor, the details of whose employment are in controversy and will be described at a later point.

The testimony of Mr. Cook, on the other hand, contradicts in many essential particulars that of Mr. Karlen. Cook testified that he sold only the building itself, either "it is f. o. b. factory, in Galesburg, Illinois, it's f. o. b. Cook Implement or f. o. b. the building site." He testified that "I told Mr. Karlen that we had to sell the building in this manner because my insurance wouldn't cover me otherwise," and that he merely contacted builder Hebron, not to hire him but to ascertain his availability for construction. He insists that he (Cook) was merely an implement dealer, handling many lines of farm implements, and that, so far as Butler is concerned, he merely "sells steel, period." Mr. Hebron, the builder who erected the building, testified that he had put up a number of Butler buildings sold by Cook to various customers. He testified that in each case the erection work was performed by him for the customer, not for Cook. He testified specifically that in the case before us he gave Karlen a price for the job and the substance of his testimony was that he was hired by Karlen. During the course of construction Karlen specified to him the location of the ventilators on the roof. Hebron testified also that there was no agreement, written or oral, under the terms of which Cook could either hire or fire him during the progress of the erection of the building, or by which they could supervise and direct his work. Finally, at the conclusion of his work, he was paid by Karlen, after, Karlen claims, Cook's approval of the payment.

With respect to the business relationship between Cook and Butler, and particularly with reference to their freedom from control by Butler as bearing on the asserted independent contractor status of Cook, Mrs. Cook, who was the bookkeeper, testified that Cook Implement was a

---

**3.** Plaintiff's claims as to Cook's alleged agency were well summarized by the trial court in the following paragraphs from his instructions:

The plaintiff claims that prior to the purchase of the building he informed Cook Implement that he intended to utilize the building to store large quantities of grain.

The plaintiff claims that prior to the purchase of the building he was supplied with literature or brochures published by defendant which expressly or impliedly warranted and guaranteed buildings of the type in question to provide safe, weathertight grain storage, to be constructed of high quality materials and to be properly designed. The plaintiff further claims that Cook Implement as an authorized agent of the defendant expressly or impliedly warranted and guaranteed that the building in question would pro-

vide a safe weathertight storage area for wheat and other small grains, and that the building would be properly constructed by an "Agribuilder" [sic] selected by the defendant or its agent.

Plaintiff alleges that the building was not weathertight and did not provide a safe place for the storage of grain, which caused some of the grain contained therein to spoil.

Plaintiff claims that in deciding to purchase and pay for the building in question the plaintiff relied on the promises, warranties, statements of fact and guarantees contained in the brochures published by the defendant and oral representation made by Cook Implement, which reliance caused him damage.

sole proprietorship, owned by Dale Cook, that Butler did not supervise their operation in any way, that they hired and fired their own employees, and that they handled their own expenses, making no accounting to Butler, that all tools and equipment were owned by Cook, that they priced Butler products in accordance with their own · judgment, in this case Karlen getting a 25% discount over the retail list price, and that their profit on the sale to Karlen was $922.20.

The written documentation of Cook's alleged agency is not clear. He is "to resell [Butler] Products" in a defined area. Although his designation as an "independent contractor" is coupled with a denial of his agency status, other parts of the agreement may be construed as indicative of an agency relationship.[4]

It was Cook's testimony with respect to this agreement, that despite its terms, however, he merely sold the steel, that "[t]his is the way we operated our business from the beginning of time," and that the agreement had never been construed by the parties as an agency agreement or as requiring an erection service, or so implemented.

It would unduly prolong this opinion to recite in more detail the many conflicts in the record as to the acts and statements of the parties to this construction. Enough has been cited to demonstrate the irreconcilable conflicts in the positions of the parties.

■ So far as the existence of actual agency deriving from the Cook-Butler agreement is concerned, the agreement, as we have noted heretofore, is ambiguous and self-contradictory. Although no South Dakota cases on point are cited to us, the Restatement of Agency 2d, § 42 [5] makes it clear that in this situation the conduct of the parties thereunder must be examined.

Interpretation by the Parties.

If the authorization is ambiguous, the interpretation acted upon by the parties controls.

Comment:

a. The subsequent conduct of the parties to an agreement with reference to it is determinative, unless it is so clearly expressed in view of the attendant circumstances that it cannot reasonably be given the interpretation which the parties indicate by their conduct. If their subsequent conduct is contrary to the terms of a clearly expressed document, it may be found either that the document did not express the agreement, in which case the document can be reformed, or that the subsequent conduct indicates a new agreement as to the authority.

Restatement of Agency 2d, § 42 at 133 (1958).

In view of Cook's statements as to the actual practice of the parties under this agreement, the issue of actual agency therefrom is in serious doubt and calls for a jury determination.

\* \* \* \* \* \*

You will maintain an erection service for the Products which shall meet our standards and specifications, and facilities for the warehousing of Products. You agree to maintain a sound financial relationship with us by meeting our credit terms. You will furnish financial reports periodically as established by the policies of our credit department. You will investigate and make reasonable efforts to handle all customer complaints.

---

4. The franchise agreement, in part, specifies:

Your relationship with us shall be that of an independent contractor, and you are not to act as an agent or employee of Butler Manufacturing Company and shall not at any time represent yourself as such. Accordingly, you cannot use or incorporate Butler and/or Agri-Builder in the firm name under which you do business unless you have received prior written approval, and it is understood that you will refrain from any use of these terms except in connection with the promotion, sale and erection of the products specified herein.

5. We note the South Dakota court's reliance upon the Restatement in the case of *Westre v. De Buhr*, 82 S.D. 276, 144 N.W.2d 734 (1966).

■ The matter of ostensible agency[6] is equally inconclusive. Plaintiff argues that Butler "held forth its Agri Builders as being especially qualified to deal with, sell and erect buildings such as the one in question" and that he relied upon the "warranties which it made and which it authorized its dealers to make." However, once again we confront an issue of fact. With respect to ostensible agency, the third person's knowledge of and reliance upon the circumstances tending to show agency between the alleged principal and his agent are a prerequisite to the admission of such circumstances in evidence. *L. A. McKean Auto Co. v. O'Marro*, 54 S.D. 435, 223 N.W. 354, 356 (1929). Should Cook's version of the negotiations leading to the sale be accepted as true, namely, that he advised Karlen that he did not undertake the erection of Butler buildings, Karlen's assertions of reliance upon Cook's ostensible authority would be seriously impeached.

With respect to the claimed and disputed agency the trial court charged as follows:

> The defendant, Butler Manufacturing Company, is sued as a principal and the plaintiff claims that Cook Implement Company was acting as its agent at the time of the occurrence.
>
> The court hereby instructs you as a matter of law that Cook Implement was the agent of the defendant as to the matters being determined in this lawsuit, and that any act or omission of Cook Implement as to the matters in question was in law the act or omission of the defendant.

■ In the state of the evidence disclosed upon this record it was error to so instruct. The evidence as to agency was in conflict and thus presented a question of fact for the jury. *Creager v. Al's Construction Co.*, 75 S.D. 482, 68 N.W.2d 484, 486 (1955); *Boyd v. Alquire*, 82 S.D. 684, 153 N.W.2d 192 (1967).[7]

Since the case must be retried, we will comment briefly upon the proofs tendered with respect to consequential damages. Because of the damaged condition of the wheat due to moisture, and plaintiff's inability to treat it successfully, he testified that he was forced to sell 13,770 bushels on May 1, 1973 at a price of $2.03 per bushel. The market in wheat rose subsequent thereto and, plaintiff urges, had he been able to hold the wheat until December or January he could have sold at $4.50 to $5.00 per bushel. He thus claimed consequential damages at $2.47 per bushel, the difference between the $2.03 per bushel for which he sold and $4.50 per bushel for which he could have sold had he been able to wait for the higher price.

In so doing plaintiff relies upon SDCL 1967, § 57–8–40,[8] providing as follows:

> 57–8–40. Consequential damages from seller's breach, items included.— Consequential damages resulting from the seller's breach include
>
> (1) Any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and
>
> (2) Injury to person or property proximately resulting from any breach of warranty.

---

6. *Agency is ostensible when by conduct or want of ordinary care the principal causes a third person to believe another, who is not actually appointed, to be his agent.* SDCL 1967 § 59–1–5.

7. When evidence is undisputed or such that minds of men could not reasonably arrive at but one conclusion, the question is one for decision by the court as a matter of law; otherwise, it is a question for the jury to decide as other issuable facts in the case. *Boyd v. Alguire*, 82 S.D. 684, 153 N.W.2d 192, 195 (1967).

8. The statutory provision quoted is taken from Section 2–715(2) of the Uniform Commercial Code.

■ This section of the Uniform Commercial Code had its origins[9] in the teachings of *Hadley v. Baxendale*, 9 Exch. 341 (1854), one court going so far as to hold that Section 2–715 of the Code "in substance * * * codifies the rule enunciated in *Hadley v. Baxendale*."[10] The official comment to this portion of the Code makes clear the intent of the draftsmen thereof.[11] This Section requires not only that the probable consequences of the breach be reasonably foreseeable, but the plaintiff cannot recover for losses he reasonably could have prevented, "by cover or otherwise," which, in turn, brings into question the possible mitigating options open to Karlen at the time of the discovery of his loss. As we held in *Lewis v. Mobil Oil Corporation*, 438 F.2d 500, 508 (8th Cir. 1971), in discussing the parallel section of the Arkansas Code:

> [T]he question here is whether the plaintiff's damage could otherwise have been reasonably prevented. The applicable doctrine is stated by Professor Williston:
>
> > " * * * [D]amages which the plaintiff might have avoided with reasonable effort without undue risk, expense, or humiliation are either not caused by the defendant's wrong or need not have been, and, therefore, are not to be charged against him.

"The principle has wide application and frequently involves the establishment of a standard of reasonable conduct.

\* \* \* \* \* \*

"Where inferior goods have been furnished under a contract, the buyer cannot recover greater consequential damages caused by using them when he knew of their unfitness, than would have been caused by another possible course, although the seller had sold the goods for that purpose. And the principle is general that there can be no recovery for consequences that reasonably could have been avoided." 11 S. Williston, Contracts § 1353 (Jaeger, 3d ed. 1968) (footnotes omitted).

*See Wawak v. Stewart*, 247 Ark. 1093, 449 S.W.2d 922 (1970); *Taylor v. Wilson*, 109 Ga.App. 658, 137 S.E.2d 353 (1964); *Oakland Metal Stamping Co. v. Forest Industries, Inc.*, 352 Mich. 119, 89 N.W.2d 503 (1958); 5 A. Corbin, Contracts §§ 1039, 1040 (1964).

■■ But beyond these requirements we are impressed with the deficiencies in the foundation tendered by Karlen in substantiation of his consequential loss. It was his assertion that he utilized his stored wheat "to balance out my tax," usually selling his wheat in December or January depending on whether the in-

9. *See* discussion in *Comments, Buyer's Remedies in Sales Cases Under the Uniform Commercial Code*, 2 Land and Water L.Rev. 419, 441 (1967), stating in part as follows:

> The consequential damages recoverable by the buyer are those meeting *Hadley v. Baxendale* requirements of notice, *i. e.*, reasonably foreseeable from the buyer's known needs which could not be minimized. Specifically, consequential damages will include losses resulting from general or particular needs of the buyer of which the seller had reason to know at the time of contracting and which the buyer could not reasonably have prevented by "cover" or otherwise. (Footnotes omitted.)

10. *Gerwin v. Southeastern California Ass'n of Seventh Day Adventists*, 14 Cal.App.3d 209, 220, 92 Cal.Rptr. 111, 118 (4th Dist. 1971).

11. 2. Subsection (2) operates to allow the buyer, in an appropriate case, any consequential damages which are the result of the seller's breach. The "tacit agreement" test for the recovery of consequential damages is rejected. Although the older rule at common law which made the seller liable for all consequential damages of which he had "reason to know" in advance is followed, the liberality of that rule is modified by refusing to permit recovery unless the buyer could not reasonably have prevented the loss by cover or otherwise. Subparagraph (2) carries forward the provisions of the prior uniform statutory provision as to consequential damages resulting from breach of warranty, but modifies the rule by requiring first that the buyer attempt to minimize his damages in good faith, either by cover or otherwise.

Official Comment, Uniform Commercial Code § 2–715 (1972).

come therefrom was needed or not, and that specifically in this case he would have kept it "until December or sometime" had its condition not required sale. In substantiation of such assertions as to his farm management practice the record contains no corroboration, or support, by income tax returns or otherwise. Defendant thus contends that no adequate foundation was laid and that the damage showing was uncertain and speculative We agree. This is not to say that the plaintiff is required to prove his consequential damages with a mathematical certainty but he must establish a basis for a reasonably certain computation. Professors White and Summers, in their treatise on the Code, comment in the certainty requirements under the Code in the following terms:

*Degree of Certainty Required in Measurement of Consequential Damages*

To say that certain items can be recovered as consequential damages is not to say that all a plaintiff need do is allege his loss. On the contrary, a defendant has two other defenses available once he has lost the foreseeability battle. First, he can avoid paying consequential damages, especially lost profits, by showing that they are too uncertain or speculative. Comment 4 to section 2–715 indicates the Code's attitude toward the certainty problem:

> The burden of proving the extent of loss incurred by way of consequential damage is on the buyer, but the section on liberal administration of remedies [1–106] rejects any doctrine of certainty which requires almost mathematical precision in the proof of loss. Loss may be determined in any manner which is reasonable under the circumstances.

Nevertheless, it is obvious that a defendant is not liable for one million dollars merely because the plaintiff testifies: "If this machine hadn't broken down, I might have made a mil-

lion dollars last year." (Footnote omitted.) [12]

The record before us discloses no adequate foundation for the establishment of Karlen's claimed consequential damages.

We will not comment on the remaining claims of error made since we cannot anticipate either their repetition or the context in which they possibly might arise. The case is reversed and remanded for further proceedings consistent herewith.

---

12. J. White and R. Summers, Handbook of the Law Under the Uniform Commercial Code, § 10–4 at 321–322 (1972).